1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10   HELEN M. TIBON,

11            Petitioner,                    No. CIV S-05-2449 GEB GGH P

12        vs.

13   DEBORAH JACQUEZ,

14            Respondent.            FINDINGS AND RECOMMENDATIONS

15   _____/

16            Petitioner is a state prisoner proceeding through counsel with a petition for writ of

17   habeas corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges her 2002 conviction for first

18   degree murder on one ground: the trial court violated her constitutional right to present a defense

19   by denying her motion for a new trial.  After carefully considering the record, the court

20   recommends that the petition be denied.

21   Anti-Terrorism and Effective Death Penalty Act (AEDPA)

22            The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this

23   petition for habeas corpus which was filed after the AEDPA became effective.  Neelley v. Nagle,

24   138 F.3d 917 (11th Cir.), citing Lindh v. Murphy, 521 U.S. 320, 117 S. Ct. 2059 (1997).  The

25   AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential

26   standards of review to be used by a federal habeas court in assessing a state court's adjudication

of a criminal defendant's claims of constitutional error.  Moore v. Calderon, 108 F.3d 261, 263 (9th Cir. 1997).

In Williams (Terry) v. Taylor, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy between "contrary to" clearly established law as enunciated by the Supreme Court, and an "unreasonable application of" that law.  Id. at 1519.  "Contrary to" clearly established law applies to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme Court on a point of law, or (2) if the state court case is materially indistinguishable from a Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to mixed questions of law and fact, that is, the application of law to fact where there are no factually on point Supreme Court cases which mandate the result for the precise factual scenario at issue.  Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the AEDPA standard of review which directs deference to be paid to state court decisions.  While the deference is not blindly automatic, "the most important point is that an *unreasonable* application of federal law is different from an incorrect application of law....[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at 1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the objectively unreasonable nature of the state court decision in light of controlling Supreme Court authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S. Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

1  contrary to, or an unreasonable application of, established Supreme Court authority. Id.  An

2  unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

3  occurred. Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

4  established Supreme Court authority reviewed must be a pronouncement on constitutional

5  principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

6  binding only on federal courts. Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

7  However, where the state courts have not addressed the constitutional issue in

8  dispute in any reasoned opinion, the federal court will independently review the record in

9  adjudication of that issue. "Independent review of the record is not de novo review of the

10  constitutional issue, but rather, the only method by which we can determine whether a silent state

11  court decision is objectively unreasonable." Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

12  2003).

13  No state court issued a reasoned opinion addressing the at-issue claim.

14  Respondent's Lodged Documents 3, 5.  Accordingly, the court will independently review the

15  record to determine whether the denial of the claim by the California Supreme Court was an

16  unreasonable application of clearly established Supreme Court authority. Himes v. Thompson,

17  336 F.3d 848, 853 (9th Cir. 2003).

18  Factual Background

19  The opinion of the California Court of Appeal contains a factual summary.  After

20  independently examining the record, the court finds this summary to be accurate and adopts it

21  below.

22  *People's Evidence*

23  Louie Arellano, the cousin of Helen and her brother, Kevin, testified that in early
    2000, Kristy Green was living with Helen and Kevin on Lock Avenue in
24  Sacramento.  Arellano lived in the home of Helen and Kevin's mother on First
    Avenue in Sacramento.  Helen, Kevin, and Green made their living by stealing
25  checks and credit cards in a mail-fraud scheme and had other people's mail sent to
    Arellano's residence.  Helen's husband, Michael Shares, along with Latanya
26  Young, David Nicol, and Wendell Wilson were involved to various degrees with

Helen and Kevin.

Near the beginning of March 2000, Arellano returned home from work and found Helen and Kevin burning mail and credit cards in his wood stove. The following morning, Arellano poked around in the stove and found half of a jawbone and teeth, which he threw away. Since Helen had told Arellano that she and Kevin were going to kill Green because Green was a "snitch," Arellano confronted Helen, accused her of killing Green, and threatened to call the police. Helen responded, "[Y]ou think they're gonna believe you? The body's in your backyard."

Arellano checked in his detached garage and found five paint buckets beneath a tarp. Four of the buckets had lids affixed but the fifth bucket's lid had been opened and Arellano saw part of the "chopped-up body" of an African American. Arellano then telephoned Helen and told her to get rid of the body and clean up the fireplace before he got home from work. When Arrellano returned home, the fireplace had been cleaned, but the buckets containing the body were still in his garage.

In a conversation at Arellano's home, Helen and Kevin told Arellano that they had killed Green by shooting her in the foot to force her to lie down on a plastic tarp. They taped the ends of the tarp shut, cutting off Green's air supply. After Green quit convulsing, they opened the tarp and she was dead. Helen and Kevin drove Green's body to Latanya Young's home and put it in her garage. Young found Green's body and it was eventually taken to Young's mother's home where Kevin and Helen dismembered it with a hacksaw "joint by joint" and put the pieces into the paint buckets.

Over the next several weeks, Arellano kept telling Helen to get rid of the body, but she refused to do so unless he helped her. Finally, Arellano agreed to drive a U-Haul truck to help dispose of the body. Arellano accompanied Kevin to Home Depot where the latter purchased a 35 gallon garbage can, duct tape, plastic bags and caulking. These items, along with bags of cement, were placed in Arellano's garage. Over the next few days, Kevin and Michael Shares were in the garage, but Arellano did not go back there.

When Arellano came back home from work one day, he found a U-Haul truck in the driveway. Helen, Kevin, Shares, and Wendel Wilson were there. Arellano helped Kevin and Shares load the garbage can, which now contained Green's body, into the U-Haul truck. Arellano drove the U-Haul truck and followed Helen's car to a secluded spot on the Sacramento River where the garbage can was rolled into the river and sank. [Footnote 3]

      [Footnote 3: Based upon Arellano's assisting in the disposal of Green's body, he pled guilty to being an accessory to murder.]

Latanya Young testified that she had been good friends with Helen and Kevin and that she knew Kristy Green. On March 7, 2000, Young received a telephone call from Helen telling her that Kevin and Shares had beaten Green to death. Young went to Helen's home and found Green in a bathtub. Green was nude, she had a gash on her head, burns were on her chest and neck, and ants were crawling on

her.  However, Green was still alive.

The next day Helen called Young and again told her that Green was dead.  Young returned to Helen's residence and Helen or Kevin opened the trunk of a car.  Inside, Young saw something shaped like a body wrapped in bubble wrap.  Helen said that she and Kevin had "muzzled [Green's] mouth with the bubble wrap" and that she could see Green "take her last breath and gasp for air."

A couple of days later, Young discovered that Green's body had been put in her garage.  Helen and Kevin came over and, along with Young, took Green's body to Young's mother's home.  Kevin put Green's body in the bathroom and proceeded to dismember it with knives and a saw.  At one point, Kevin emerged from the bathroom and held up Green's severed head, saying, "Fatality," a term from a computer game called Mortal Combat.  After Green's body parts were placed in buckets, Young helped dispose of bloody clothing and other items. [Footnote 4]

> [Footnote 4: Young agreed to plead guilty to being an accessory in disposing of Green's body in exchange for testifying.]

Kevin took Nicol to Arellano's garage where, in one of the buckets, Nicol observed a human torso, shoulder, and some arteries and veins.  The body was that of an African-American.  He touched a body part because he was "curious."  Nicol had no doubt that what he touched was a human body. [Footnote 5]

> [Footnote 5: At the time of his testimony, Nicol was serving a federal sentence for his part in the mail-fraud scheme.]

Wendell Wilson accompanied Helen, Kevin, Arrellano, and Shares to the location on the Sacramento River where the garbage can was dumped into the river. [Footnote 6]

> [Footnote 6: Wilson also pled guilty to being an accessory in the disposal of Green's body.]

In the course of investigating Green's disappearance, neither Green's body nor any physical evidence connected with her killing was found.

*Defense Evidence*

Helen did not testify.  Kevin testified, denying that he or anyone had killed Green.  Instead, the purported killing of Green was staged to make Young, Arrellano, Shares, and Wilson believe they were accessories to a murder, which would keep them in line so they would not tell about the mail-fraud scheme.  Kevin claimed the paint cans were filled with dog feces and sticks, not Green's body.

Kevin was impeached by three interviews he had with the police.  He initially denied knowing that Green was dead.  In the second interview, Kevin said that Helen had killed Green and dismembered her body, but he was not present when she did so.  And in the third interview, Kevin admitted he was present when Helen killed Green and he had assisted in cutting up her body.

Kevin testified his stories to the police changed because the police threatened him and told him to give a statement consistent with those given by other witnesses.

In an effort to show that Green was still alive after her alleged death, Helen called Shane Allen as a witness.  On direct examination, Allen testified that on May 1, 2002, he and his girlfriend, Jessica Lovins, encountered a female "acquaintance" with whom they "had had problems with awhile back where [they] were living." While in the parking lot, the female made threatening remarks to Allen while holding a club for locking a steering wheel.  Allen and Lovins left and Allen reported the incident to the police.  About a month later, Allen was shown two "really bad quality" black and white photos and selected a person whom he thought was the person who assaulted him, which was a photo of Kristy Green.

On cross-examination, Allen gave considerably more detail about the encounter. Allen testified that the name of the person with whom he had the encounter was "Latisha," and she lived in the same apartment complex where he and Lovins resided.  Allen was later shown five color photos and immediately selected the picture of Latisha Baptiste as the assailant. [Footnote 7] The prosecutor

> [Footnote 7: During Kevin's testimony, he admitted knowing that Green had some checks with the name Latisha Baptiste on them.]

then had Latisha Baptiste brought into court. Allen identified Baptiste, stating that there was no question in his mind that Baptiste was the person who held the club in the parking lot.  Lovins, too, made an in-court identification of Latisha Baptiste as the person with whom she and Allen had the encounter.

Respondent's Lodged Document 3, pp. 2-5.

Analysis

Petitioner argues that the trial court's denial of her motion for a new trial denied her right to present a defense.  The background to this claim is summarized in the opinion of the California Court of Appeal.  After independently reviewing the record, the court finds this summary to be accurate and adopts it below.

At the hearing on the new trial motion, Christopher Rowe, who was then serving time in prison for possession of cocaine for sale, testified that he had grown up with Helen and Kevin and had met Kristy Green in 1995 at Helen's home.  Rowe, who had "jumped bail" and failed to show for sentencing in January 2002, saw and spoke with Kristy Green at Ray's Taco Rico around March 6, 2002.  Green was wearing a red wig and "didn't look the same."  She had scrapes or burn marks on her arm.  Later that day, he and Green went to Rowe's sister's house where they smoked marijuana and had sex.  While Rowe was in the prison yard, he learned of Helen's conviction for Green's murder from "Boss" who showed him a newspaper clipping.  Rowe had grown up with "Boss" and had known him 12 years; however, Rowe did not know Boss's real name.

1    Tandra Davis testified that she worked for Money Mart from January 2001 to
     November 2002.  Money Mart business records showed that Davis cashed a
2    welfare check on November 3, 2001, for a customer identifying herself as Kristy
     Green.  Although Davis serviced 50 to 60 customers a day, she remembered the
3    transaction with Green because Green had been "antsy" and three weeks later
     Davis was questioned by an investigator about Green's having cashed a fraudulent
4    check.  Davis was unable to remember what Green was wearing, what form of
     identification she presented, or whether anyone was with Green.
5
     On January 6, 2003, Davis was shown two photographs of Kristy Green by a
6    defense investigator.  Davis identified Green as the person who cashed the check
     on November 3, 2001.
7
     Brenda Zeno, Tandra Davis's mother, testified that when the defense investigator
8    was showing the photos of Kristy Green to her daughter, Zeno also looked at
     them.  Zeno thought that in November 2002, she has seen Green at Consumes
9    River College and at the WIC office (a women's nutritional program) and had
     spoken with her.  Zeno was not wearing her "reading glasses" when she viewed
10   the photos.  Zeno told the investigator that she was "almost completely positive"
     that the person in the photo was the same person she was speaking about.
11
     The court denied the motion, finding that even if the new evidence had been
12   presented, the jury would not have returned a different verdict.

13   Respondent's Lodged Document 3, pp. 8-9.

14          Relying primarily on Chambers v. Mississippi, 410 U.S. 284, 93 S. Ct. 1038

15   (1973) and Rock v. Arkansas, 483 U.S. 44, 107 S. Ct. 2704 (1987), petitioner argues that the trial

16   court's denial of the new trial motion based on newly discovered evidence violated her right to

17   present a defense.  While criminal defendants have a constitutional right to present a defense, see

18   Greene v. Lambert, 288 F.3d 1081, 1090 (9th Cir. 2002), neither Chambers v. Mississippi nor

19   Rock v. Arkansas stand for the proposition that the denial of a motion for a new trial based on

20   newly discovered evidence may violate this right.  Rather, these cases involve events occurring

21   during criminal trials.  This court is aware of no clearly established Supreme Court authority

22   standing for the proposition argued by petitioner.

23          Petitioner has not identified any more specific constitutional provisions violated

24   by the denial of her new trial motion.  Petitioner does not contend that the newly discovered

25   evidence was suppressed by the prosecution.  Petitioner does not contend that there was

26   insufficient evidence to support her conviction.  Petitioner also does not allege that she received

                                         7

1   ineffective assistance of counsel at her new trial motion.  Petitioner does not claim that she is

2   actually innocent.[1]  Petitioner's only claim is that the trial court reached the wrong conclusion

3   even though it followed the right procedures.

4          Even if petitioner were able to identify clearly established federal law requiring a

5   new trial if new evidence emerged, for the reasons stated by the California Court of Appeal, the

6   trial court did not err in denying the motion:

7          Helen argues the court's ruling was error because the new evidence, if believed,
           would have compelled the jury to acquit her.  The evidence was likely to have
8          been believed, Helen continues, because neither Davis nor Zeno had any
           connection with either Helen or Kevin, and Davis's testimony was backed up by
9          business records showing that the November 3, 2001 transaction with Green
           occurred after Green's purported death. [Footnote 8] The argument

10
                  [Footnote 8: Understandably, Helen does not rely on the testimony of
11                Rowe nor the letter purportedly written by Green after the charged date of
                  her death.]
12
           is not persuasive.
13
           The Money Mart records showed only that Davis cashed a check on November 3,
14         2001, for someone identifying herself as Kristy Green.  However, the weight to be
           accorded to these records was essentially nullified because, in the words of the
15         trial court, Helen and Kevin were "immersed in the commission of the use of
           disguise, deceit and fraud."  Thus, it would not have been difficult for Helen and
16         Kevin to find a suitable substitute for Green in order to cash a check.

17         Nor were Davis's and Zeno's photographic identifications of Green particularly
           reliable.  Davis and Zeno were shown only photographs of Green, which they
18         viewed at the same time.  Davis's photo identification of Green occurred on
           January 6, 2003, which was well over a year after the check cashing transaction.
19         Davis did not leave her employment at Money Mart until November 2002, during
           which time she serviced 50 to 60 customers a day during the week.
20         Notwithstanding the number of people Davis serviced since the November 3,
           2001, transaction, she claimed to have remembered Green partly because "it was a
21         busy day" and Green "wasn't in the mood for waiting."  However, when it was
           pointed out to Davis that November 3, 2001, was a Saturday, Davis admitted that
22         Saturdays were "light day[s]."  Additionally, Davis was unable to remember what
           type of identification Green presented, what Green was wearing, or if Green was
23         with anyone.  Finally, Kristy Green's name was on the bottom of the photographs
           shown to her by the investigator, which was a highly suggestive circumstance.

24

25

26         [1] But see an explanation of that claim below in any event.

                                                 8

Zeno's identification was likewise unreliable. Zeno was present when the defense investigator was showing Green's photographs to Davis, and Zeno overheard their conversation, which included Davis's identification of Green. Although Zeno testified at various times that she was positive of her identification of Green as the person whom she had seen and spoken with at school and at the WIC office, Zeno initially described her identification of Green as follows: The investigator was showing the photographs to Davis when "I came outside. And I just looked at 'em and I wasn't—I didn't even have, like, my reading glasses on. So I couldn't read it, so I said, oh, she looks familiar. That looks, you know—and that was that."

In contrast to the evidence offered in support of the motion for a new trial, the evidence at trial showed that Helen and Kevin, along with Kristy Green and others, were involved in a mail-fraud scheme using fake identifies. Helen and Kevin were concerned that Green, who had been arrested, was going to inform on them, so they bailed her out with the intent of killing her. Young testified that Helen and Kevin told her they had killed Green, she saw a body that Helen and Kevin said was that of Green, and Young saw Green's severed head when Kevin held it up, saying "Fatality."

Arellano, who knew of Helen's and Kevin's threat to kill Green, found teeth and a jawbone in his stove. He confronted Helen and she told him the body was in his backyard. He checked and found five paint buckets, one of which was partially open and contained body parts of an African American. Helen and Kevin admitted to Arellano that they had killed and dismembered Green's body.

David Nicol testified that Helen showed him the buckets in Arellano's garage. Nicol touched a torso, which was of an African American.

Comparing the evidence at trial with that offered at the new trial motion, the trial court could reasonably conclude that for the jury to have come to a different result than it did, the jury would have to reject the trial testimony, which bordered on overwhelmingly showing that Helen and Kevin killed Green, in favor of the weak evidence relating to the identifications made by Davis and Zeno. Given the unlikelihood of such a scenario, the trial court did not abuse its discretion in denying the new trial motion.

Respondent's Lodged Document 3, pp. 10-13.

This court has reviewed the record and agrees that the evidence against petitioner at trial bordered on overwhelming. For the reasons expressed by the Court of Appeal, as well as those below, it is highly unlikely that a jury would have come to a different result had it heard the evidence presented at the new trial motion.

Construing the petition broadly, and departing from the identified claim, petitioner, in essence, attempts to present a claim of actual innocence. Obviously, if the evidence

9

presented at the motion for new trial were true, petitioner would be actually innocent of killing

the victim because the victim would still be alive.  However, the standard for such a claim is

exceedingly high.

> We conclude that the Herrera majority's statement that the
> threshold for a freestanding claim of innocence would have to be
> "extraordinarily high," id. at 417, 113 S.Ct. at 869; accord id. at
> 426, 113 S.Ct. at 874 (O'Connor, J., concurring), contemplates a
> stronger showing than insufficiency of the evidence to convict.  We
> therefore decline to adopt the modified Jackson standard.  We
> believe that the required showing would have to be at least as high
> as the more demanding standard articulated by Justice Blackmun in
> his Herrera dissent. Justice Blackmun stated that to be entitled to
> relief, a habeas petitioner asserting a freestanding innocence claim
> must go beyond demonstrating doubt about his guilt, and must
> affirmatively prove that he is probably innocent. See Herrera, 506
> U.S. at 442-44, 113 S.Ct. at 882-83 (Blackmun, J., dissenting).

> We conclude that the Herrera majority's statement that the
> threshold for a freestanding claim of innocence would have to be
> "extraordinarily high," id. at 417, 113 S.Ct. at 869; accord id. at
> 426, 113 S.Ct. at 874 (O'Connor, J., concurring), contemplates a
> stronger showing than insufficiency of the evidence to convict.  We
> therefore decline to adopt the modified Jackson standard.  We
> believe that the required showing would have to be at least as high
> as the more demanding standard articulated by Justice Blackmun in
> his Herrera dissent.  Justice Blackmun stated that to be entitled to
> relief, a habeas petitioner asserting a freestanding innocence claim
> must go beyond demonstrating doubt about his guilt, and must
> affirmatively prove that he is probably innocent.  See Herrera, 506
> U.S. at 442-44, 113 S.Ct. at 882-83 (Blackmun, J., dissenting).

Carriger v. Stewart, 132 F.3d 463, 476 (9th Cir. 1997) (en banc).

The California Court of Appeal gave cogent reasons for finding no merit in

petitioner's innocence assertions.  In addition, the undersigned notes that while involved

defendants testifying after plea bargain might generally have some credibility issues, such is not

the case here.  The accessories-after-the-fact to this murder would have no incentive whatsoever

to confess to being accessories to a crime that they knew was never committed.  Why would they

accept jail sentence if they had no information that Green had indeed met her demise and

aftermath in the horrible fashion portrayed?  No evidence was presented at all that these persons

had such a "beef" with petitioner that they would set up this murder, i.e., make up the gruesome

1  testimony in order to put petitioner away for life and would willingly pay the price of some years

2  in prison for this psychic pleasure.

3          The undersigned understands that the threshold for an evidentiary hearing is not

4  all that high.  Generally, an AEDPA petitioner only need meet two requirements to obtain an

5  evidentiary hearing: (1) allege facts, which if proven, would entitle the petitioner to relief, and (2)

6  show that he did not receive a full and fair hearing in a state court, either at the time of trial or in

7  a collateral proceeding.  Gonzalez v. Pliler,  341 F.3d 897, 903 (9th Cir. 2003).  However, the

8  court does not have to hold an evidentiary hearing when the record clearly refutes the collateral

9  factual allegations raised by petitioner.  Schiro v. Landrigan,  __U.S.__, 127 S. Ct. 1933, 1940

10  (2007); similarly, palpably incredible or patently frivolous claims need not garner an evidentiary

11  hearing just because the petition "says so."  United States v. Leonti, 326 F.3d 1111, 1116 (9th

12  Cir. 2003).  In addition, the court retains some discretion to utilize expansion of the record in lieu

13  of a full fledged trial type hearing.  Where the district court concludes that "[a full evidentiary]

14  hearing would not offer any reasonable chance of altering [the court's] view of the facts," as

15  presented by the record and any expansions thereto, a trial type hearing will not be necessary.

16  Williams v. Woodford, 384 F.3d 567, 591 (9th Cir. 2004).  In utilizing this discretion, the

17  undersigned understands that matters of credibility are not often determined on the basis of the

18  record.

19          Given the very high standard for actual innocence claims, and in light of that

20  standard, the palpable frivolity of the actual innocence assertion, the court declines to hold an

21  evidentiary hearing.  In the absence of objective evidence that Green lives, e.g., DNA or dental

22  records, or fingerprints, an evidentiary hearing would simply be a retrial involving the

23  prosecution's witnesses versus petitioner's witnesses.  The very best petitioner could hope for

24  would be that her evidence raised a doubt in the court's mind as to her guilt.  The actual

25  innocence claim would still be denied.

26  \\\\\

1    After independently reviewing the record, the court finds that the denial of

2 petitioner's claim by the California Supreme Court was not an unreasonable application of

3 clearly established Supreme Court authority.

4    Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for

5 a writ of habeas corpus be denied.

6    These findings and recommendations are submitted to the United States District

7 Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

8 days after being served with these findings and recommendations, any party may file written

9 objections with the court and serve a copy on all parties.  Such a document should be captioned

10 "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

11 shall be served and filed within ten days after service of the objections.  The parties are advised

12 that failure to file objections within the specified time may waive the right to appeal the District

13 Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

14 DATED: 12/11/07

/s/ Gregory G. Hollows

15

16 UNITED STATES MAGISTRATE JUDGE

17 tib2449.157

18

19

20

21

22

23

24

25

26